Ms. Watson, will you call our next case, please? 15-0823, Buehler v. Othman All right. Will counsel for the parties please approach? Tell us your names and who you represent. Chan Yuan, Buehler v. Othman All right. Mary Hodson, Buehler, on behalf of the people of the state of Illinois. And Mr. Yun, how much time would you like to argue? I would request 15 minutes for argument and five minutes for rebuttal, please. Okay. And Ms. Hasenbuehler? 15 minutes, sir. Okay. Great. And you both know, because you've been here before, that we've read all the briefs, we're familiar with the records, so if you would focus on the issues. These microphones are not for amplification, they're just for recording, so if you'd keep your voice up so all our wonderful audience members can hear you. All right. Mr. Yun, would you like to proceed? Sure. May it please the Court. Good morning, Your Honors. My name is Chan Yuan. I represent Othman. Per this Court's order, I will be addressing the application of people v. Holman to a bad sentencing issue, and I will also touch upon the weaknesses in the state's evidence. At sentencing, the trial judge stated the following when speaking to Abed, and I quote, you joined the two Sixers when you were 16 years old. According to you, you terminated that four years ago. Unfortunately, by that time, what you could become as a man was already set in stone, sir. That statement, that the man Abed would become was already set in stone at the age of 16, is extremely contrary to the central teaching of Miller, that children are different from juveniles, that their character traits are less fixed, and indeed, the judge's words indicate that she did not consider whether Abed's decision to join the street gang was a result of his youth and, excuse me, immaturity, but rather assumed that his actions as a teenager would set the tone for the rest of his life. Well, you're taking a statement out of what was a pretty extensive sentencing hearing. So it's correct, isn't it, that even after Miller, if a court sentencing a juvenile defendant does consider the Holman factors, it's not necessary to remand, correct? That's true if the judge considers the Holman factors, but our position here is that she did not consider the Holman factors, and I think that very statement that she makes about Abed being set in stone shows that she did, that belies that presumption that she considered the Holman factors. She also said, I'm going to give you some hope, right? I'm going to impose a sentence that will give you some hope. Your Honor, when she said that she would give the defendant some hope, and then she sentences him to 55 years in prison, that is not, it's our position that sentencing someone, saying that you're going to give someone hope, and then sentencing him to a sentence that he will be out when he's 76 years old, I don't think that is really, when we look at that realistically, that can be considered as giving someone hope. Would you make the same argument if she had given your client the minimum 20-year sentence plus the 25-year add-on, and so he's getting out at 66 instead of 76? Your Honor, yes. So really, no matter what sentence the trial court imposed, even if it was the minimum she could have imposed, you would consider that a de facto life sentence? Yes. Forty-five years in life would result in, as Your Honor stated, a bed being released at the age of 66. Still a life sentence for our purposes, but this issue of what term of years constitutes a life sentence is currently before the Supreme Court and people leave buffer. So that question does not need to be addressed today, and if this matter, what's clear here is that a bed sentence of 55 years is a life sentence that will result in him being released at the age of 76. If this matter was remanded for resentencing, then the trial judge would have the discretion to apply the firearm enhancement in light of the new law that went into effect in 2016, and then that trial judge could fashion a sentence that is more in line with a bed's age and his prospects for rehabilitation. Isn't another part of the problem, though, truth in sentencing? When she sentenced him to 55 years, it was 100% of 55 years, and truth in sentencing as it applies to juveniles was never really discussed in the legislature. It was never debated as it applies to juveniles, and it locks them in to an adult concept and gives them no hope of ever facing a parole board. So if she was saying, I'll give you some hope, and, oh, by the way, I'm not going to pay attention to truth in sentencing because it's a bad law anyhow, and I'm going to let you go up for parole in a couple of years, which couldn't work, but if she's been able to do that, if she's been able to ignore the truth in sentencing act, then she could have said, oh, well, you know, you'll have your chance in 10 years or 15 years to show that you have rehabilitated yourself and that you're no longer subject to the whims and complacency of youth, but that doesn't exist in Illinois for juvenile defenders. Sure, I would agree with that, Your Honor. If there was no mandatory, right now a guy would have to serve the entire sentence, the entire 55 years, regardless of his behavior in prison or what happens in prison, but if there was, if the legislature changed the law and allowed for some discretion to be applied for there to be perhaps a parole hearing in a term of years, I would agree then that the sentence of 55 years with the possibility of parole at a certain X number of years would be an appropriate sentence, but here that's not the case. Here he's serving the entire 55 years, over a half century in prison, and with all due respect, that's not really giving anyone hope. That's not giving him hope. Assuming he survives the sentence, when he gets out, what is there left for him? Most of the people that he knows and loves are going to be gone. The world would be entirely different. Does he really have... You could say that, though. What I don't see the cases following Miller saying is that everyone, every juvenile who was sentenced to a lengthy term of years for a crime committed as a juvenile is entitled to a new sentencing hearing. Is there a bright line rule that you're advocating? Well, there is no bright line rule in terms of the years, the term of years, but what Miller tells us is that a life sentence, a de facto life sentence, or anything that dooms the juvenile to essentially what is life in prison is only reserved for the rare juvenile offender that exhibits irreparable corruption. And in this case, you don't have those facts that would support such a finding. And if you look at that criminal record, it's relatively minor. You don't have any violent offenses. You have a 2008 theft when he was age 17. You have a 2010 burglary when he was age 19. Those are his convictions. And at sentencing they talk about two other offenses in aggravation that were pending at the time, a 2012 drug possession and a 2014 possession of a weapon in a penal institution. But, again, those are not inherently violent offenses. And here you just don't have the record that shows someone who is irreparably corrupt. The judge mentions the fact that he left the gang after four years, but obviously she didn't consider that as a mitigating factor. But, again, that would show that he is capable of change, that he is capable of maturing, or that he was actually maturing at the time of sentencing. So the facts here just do not support the finding that he is one of those rare few juvenile offenders that is beyond redemption. And in Holman, the case was quite different. You have in that case a juvenile offender. And the Supreme Court, just to give some background, the Supreme Court did upheld that sentence, but it was not because the judge had simply reviewed the PSI. It was because in that case there was an overwhelming aggravating factor that outweighed any mitigation. The fact that this defendant in Holman went on a crime spree resulting in multiple deaths, he had actually admitted to eight murders in his statement to the police, that is the type of rare juvenile offender where a life sentence would be appropriate. But here you just do not have those facts. You have someone who was immature, impetuous, did not appreciate the risks of the consequences of his actions. Well, actually, the way he characterized himself was not as impetuous. He said, I'm a devout religious man. His lawyer characterized him as thoughtful and somewhat sensitive. So you have all these permutations in a sentencing hearing. And what Holman is saying, as I read it, is as long as the court considers the six factors that the court identified and any other relevant factors in determining a sentence, that's the sentencing hearing that the juvenile is entitled to. Well, first of all, his saying, his remarks at the sentencing hearing, those were made when he was 24 years old. And this offense and a lot of the things that happened in his life in terms of delinquency happened when he was 16 and 17. So he's matured from that time, from that time in 2008 to the sentencing hearing in 2015. There is a change in his character. You see that by how he's describing himself. And then second of all, it's our position that the judge did not consider the other factors. That statement that he was set in stone demonstrates that. She is basing that on the fact that a bad joint is streaking at the age of 16 without considering whether that decision was influenced by his immaturity or his impetuosity. And she completely ignored the fact that he left the gang in four years, which would show that he is capable of rehabilitation, that he was actually changing during that time. So our position is that the court didn't consider the other factors, and that is the constitutional violation here and sentencing him to what amounts to a life sentence. All right. And you said you also wanted to address the sufficiency of the evidence. Yes, Your Honor. Just I would like to point out that the evidence in this case was as close, if not insufficient. And thus the many trial errors in this case were more pronounced and more likely to be prejudicial. Although I don't have enough time to go through each and every error, I would just like to point out that there was a zero violation in this case. The state concedes that point. And people v. Sebi, in people v. Sebi, our Supreme Court held that when there is a zero violation, which is, again, undisputed in this case, and the evidence is as close, then the defendant is entitled to a new trial. So that would be our position. And just going through the evidence very briefly, first I would just want to point out that this is a cold case. The offense occurred on April 29, 2008, and a veteran was arrested on August 8, 2012. So over four years. And during those four years, it's not as if the state obtained meaningful, solid evidence of guilt. They instead relied on three witnesses, all with serious credibility issues. You have a jailhouse snitch, Ilya Mansour, who admitted that he essentially does this for a living. He was duping two other inmates at the same time he was speaking with a bed. And he was also, his criminal background is just full of, consists of crimes of dishonesty. Two forgeries. You have a theft by deception, which was reduced to a misdemeanor as part of his deal with the state. So, again, an untrustworthy witness. And the same can be said about Janice Lloyd, who admitted to smoking crack the day before this incident occurred. And actually admitted to smoking crack the day before testifying. And also the day of the crime. Yes, the day of the crime. The day before and the day of the crime. Yes, yes. So she is, again, her testimony is suspicious, suspicious to say the least. And then you have, finally, the romantic rival, Matthew Fernandez, who testified that a bed made this inculpatory statement. But he told the police about this statement three years after the fact. And at that time, he was interested in a bed's ex-girlfriend and knew that a bed was going to be released from prison. So, again, all of these shortcomings in the witness's testimony and credibility were argued to the jury, right? Yes. The jury did hear, or the jury, during cross-examination, the defense counsel did his best to discredit the witnesses. But even in the light most favorable to the state, which is the standard, we acknowledge that as the standard here, these witnesses are simply, they're just not credible. For sufficiency of the evidence sake, that's for you or others to decide. Our position is that it is not sufficient in terms of, for guilt. But at the very least, it shows that the evidence is close in this case. And since the evidence is close, under SEBI, because there's a zero violation, this matter should be remanded for. There was no direct evidence. It's all circumstantial. Exactly. No gun was found. There is no. No eyewitness to the crime. No, no. There was no physical evidence. No eyewitnesses, no gun, no DNA, no fingerprints, nothing. You have the word of a jailhouse snitch, a drug addict, and a romantic rival linking him to this offense. So our position would be the evidence is very close, if not insufficient to convict. You also have the inappropriate comment in closing by the prosecutor. Yes. You have many trial errors. And our position is that all of them are more pronounced because the evidence is close in this case. And proper jury instruction. Exactly. The proper jury instruction, you have a hearsay violation. You have just what amounts to it's not a clean trial at all. And when the evidence is like this, matters should be remanded for resentencing. So to conclude, I urge this Court to grant the relief that we requested in our briefs. In reference to the issues that we discussed, there should be remanded for a new trial in light of the Zair violation. At the very least, should be remanded for resentencing in light of the fact that the judge clearly did not consider the mild factors that sentenced him to what amounts to life in prison. Thank you. Do you believe the Zair violation is a mandatory remand? Yes, I do believe it's a mandatory remand because the evidence is close. And that's what our Supreme Court held when people resubbied. So that would be our position. Do you want to stand on your brief on the issue of Beatrice's statement that the defendant told her to hold a gun, any gun, two years after this crime and that information was allowed to be presented to the jury, even though the defense objected to it? Thank you, Justice. I'd like you to argue that. And then there was an instruction that that could be used for intent? Yes, Your Honor. That was one of the big errors here. Again, the focus was on the Zair violation because that's undisputed. But when you look at that error, that specific error that happened in this case, other crimes evidence that was introduced for no other purpose but to corroborate the jailhouse's history of human source testimony. That was the carrying of the gun was actually two years after. Exactly. It had nothing to do with the murder. And there was no evidence that this was allowed in. No, that evidence, this gun, this incident that occurred two years later had nothing to do with the offense at issue here, the murder at issue here. And again, you can't just introduce, and this is all in our brief, but you cannot just introduce evidence to corroborate a prosecution witness's testimony in that, or other crimes evidence specifically. So that was a clear error in this case. And again, another ground for this Court to remand this for a new trial. Well, you also argue that it was prejudicial because it went to the heart of whether or not this guy was a bad guy. The jury could believe from this that he was just generally a bad guy. Yes, but in all other crimes evidence, that's the danger of other crimes evidence, that it allows the jury to come to the conclusion that, or convict on the basis that this guy's a criminal, not because he committed a crime. That's not how. It seems odd because if you're going to try and show intent, it seems to me, you'd be trying to show intent to commit this particular crime. And I don't know how you could show intent to commit this particular crime two years later with a gun that's not related to the crime. Exactly. So that, yeah. If they were trying to show intent, they might have, if they had a witness that said, oh, yeah, he gave me his gun the night after the crime or the day before the crime, or, you know, I saw the, but that's not what she was saying. She said, he asked me to hold a gun. It was two years. It was any gun, and it was two years later. Exactly. So that is definitely, that jury instruction had really no relevance to why, first of all, why the other crimes evidence was introduced. So you have, in that issue, you have an error that's twofold. You have an introduction of improper other crimes evidence, and then the judge essentially magnifies the error by giving the unnecessary jury instruction about that they can use this other crimes evidence for the purpose of intent. And that's clearly, it's unrelated to the offense, and it was introduced to corroborate Ilya Mansoor's testimony, which, again, is an error in itself. So you just have a multitude of errors in this case. You do have prosecutorial misconduct. You have the zero violation. You have this other crimes evidence that was improperly introduced. What's the standard of review on the inappropriate comment made by the prosecutor in closing? So prosecutorial misconduct, I believe, is abuse of discretion. But in this case, that error was particular. The case law says that there will be a de novo review. I think there is some, from my understanding of law, there is some dispute as to what the correct standard of review is. But nonetheless, in this case, you have this instance of prosecutorial misconduct is just, it's worse than other forms because it's a violation of the judge's express ruling. The judge said, hey, don't topple or I'm going to sustain the objection to this hearsay testimony. The defendant believed the visiting room was bugged, but the presence of cameras in the room was brought out on cross-examination. Right? Well, in other words, the prosecutor didn't say in closing argument, and he believed the visiting room was bugged. That's why he didn't confess again. He said he knew the visiting room was being recorded, and on cross-examination, defense counsel brought out that there were cameras all over the place and that the defendant knew it. Well, my response to that would just be, there was an express ruling stating that the prosecutor could not get into what the defendant was thinking during the interview, and that is what the problem is here. She said that he knew that the area was bugged. That's different from knowing that there is. Yes, Your Honor? So in Munser's testimony, he didn't say that the defendant said to him, and he was wired, so there's no transcript of him saying, listen, bud, I can't talk to you because this place is wired and there are cameras all over the place and it's being recorded. What Munser said was he thought that the defendant wouldn't talk to him about the murder because there were cameras. So when the defense attorney asked if there were cameras, he was just confirming that Munser knew that there were cameras. He wasn't confirming that the defendant actually said, hey, guy, I can't talk to you about this because of the cameras. Then the state's attorney in the closing argument said the defendant knew it was being recorded. The defendant knew there were cameras. There's nothing in the record that says the defendant knew that. There's only something in the record that says Munser thought the defendant knew the place was wired. Exactly. So that's the error. So it was an opinion of Munser's that the prosecutor was confirming in the closing argument. Yes. So that's the error. Exactly. It's describing something that was in the mind of someone. Well, it was also that the judge precluded the evidence in addition to it was getting into his mind, but the evidence was already precluded. Yes, yes. And then the prosecutor commented. The prosecutor voted out anyway in closing. Yes, that's correct. The evidence had not come out during the trial. No, no, it had not. Yes, Your Honor. If there's no other questions, Your Honors, I would just again reiterate that to request a relief grant, that we requested in our briefs. Thank you, Your Honor.  Ms. Hanson-Gillard. Good morning, Your Honors. Again, Mary Hanson-Gillard on behalf of the people of the State of Illinois. I will first address the People v. Holman issue. It's the State's position that the defendant's 55-year sentence is not a de facto life sentence. It's a survivable sentence. The defendant will have an opportunity to see life outside of the prison walls. At age 76. At age 76. The 55-year sentence. As a matter of fact, several appellate courts have found that a 54-year sentence and a 53-year sentence are not de facto life. And the concern with Holman and with these life sentences is that they do, that a defendant, a juvenile defendant, will have no hope of ever seeing life outside. But in this case, the defendant will. Because it's only a 55-year sentence. So how do we, you know, there are cases, I think you can probably find a case for any proposition you want that a particular length of sentence is or is not a de facto life sentence. And so how does a court of review draw the line? Well, we're going to get guidance from the Illinois Supreme Court in the People v. Buffer case. Because the issue in that case is, what is the term of years that defines a de facto life sentence? So as counsel stated, we request that you hold this issue in abeyance until the Illinois Supreme Court has stated. Because when you look at the cases, you look at a 54-year old, is it not a de facto life? And then a 60-year sentence is a de facto life. So we need to get some guidance from the Illinois Supreme Court to determine what is that fine line. We recognize that our case is right in the middle there. But it's our position that it is not a de facto life because this defendant will survive in his lifetime to see outside prison walls. But isn't part of that analysis the analytics, the statistics about the life expectancy of somebody in jail? That's right. And isn't that currently reported to be somewhere around the age 69? Yes, it is. But that's what the Illinois Supreme Court is going to address in People v. Buffer. So they will look at the analysis and all the articles that have been discussing that to determine whether that right line is. Isn't part of the complication that you face, though, that this judge never really specifically found whether or not this defendant was irredeemably incorrigible? Well, she didn't use those words, but she did review the factors that have shown it was set in stone. She said, well, it was set in stone. However, she did discover, she did go through all five factors. She did know that the defendant was 17 when he committed this offense. Defendant was arrested for 20. . . Let's get to the fifth factor. The fifth factor. No, and she did consider the defense prospect of rehabilitation. Defense counsel argued at length how young this man was. Give this man some hope. Show some compassion. Show that this man can live a productive life. And the trial judge heard this. The trial judge heard this when she said, I've considered the factors of aggravation and mitigation, and I'm going to sentence you, as your attorney asks, to some hope. The sentence you need here was 45 to natural life. She sentenced him to just 10 years over the minimum. And this is where she also considered the other factors. I mean, this was a case where the defendant shot his cousin three times in the head. Then he's gone for four years. And the defendant, when you say about the, you know, incorrigibility, this defendant is not the stellar defendant. His defense counsel here makes him out to be. When the defendant, in 2010, he pled guilty to a burglary. So he's got this burglary. That's where he meets Mr. Manzor in Cook County Department of Corrections. But then after, when he's pending on this case, the defendant in 2014 was coming to a court appearance. And on his way back, he asks, he gets off the bus, and he tells the correction officer, I need to spit. And he pulls out a three-foot metal rod that the video showed in the bus, and he actually pulled up, intended to take it into the Cook County jail. Probably thought better to throw away because he would have gotten caught. But this isn't the stellar defendant that the defendant makes out to be. This is a defendant who killed his uncle. The court is directed by Mueller v. Alabama, and People v. Holman did consider the factors in determining that it was a 55-year sentence. Well, that's what makes this case difficult for me. Everything you just said. But at what point are the errors so numerous in a case that the appellate courts send it back for a new trial? At what point? Well, with regard to the reasonable doubt argument, the jury heard, the jury knew about Mr. Manzor. The jury knew that he had, that his death by deception was reduced. The jury knew that he received compensation from the state in terms of living expenses over a three-year period. But the jury also heard Mr. Manzor and the things that the defendant told him while they were in custody, and those things were corroborated. Number one, the defendant said, I shot the victim three times, one in the eye, two in the head. That was confirmed by the medical examiner. Number two, the murder occurred two years ago, and as a matter of fact, Mr. Manzor also testified on cross that it was 2008. Again, the corroboration when this victim passed away. The defendant said that he used a .25 caliber. .25 caliber cases were recovered. Three were recovered from the victim's head. The defendant said he hid his gun, that it rusted. Confirmation from the investigator, the weather. The weather confirmed it was rain that day, the gun got rusted. Five, the area where it occurred. Crowntown, Kedzie 63rd. This happened in South Spaulding. This other one, his cousin Rashid, he committed a shooter on his birthday. That also was confirmed. Getting to the eighth one. The defendant told his girlfriend, Beatrice, and he named the girlfriend when he spoke to Mr. Manzor. Mr. Manzor now had a name. He said he asked his girlfriend to carry his gun in 2010. And that evidence supported Mr. Manzor's. All those things were corroborated by investigators, the medical examiner, and by Beatrice herself. So these things show that the defendant was proven guilty beyond a reasonable doubt. Now, couldn't the State have corroborated the aspect of Mr. Manzor's testimony simply by calling Beatrice Herrera to the stand, saying, do you know the defendant and did you date the defendant? Were you his girlfriend in 2008? That corroborates Mr. Manzor's testimony. The additional question about, and did he ask you to hold the gun for him, why do you need that corroboration? Because that corroborated the accuracy and the reliability of the defendant's confession to Mr. Manzor. Because the defendant specifically said to Mr. Manzor, I had a girlfriend, Beatrice Herrera, she's 15 years old, and I asked her to carry a gun. That is additional corroboration. But he didn't say this was the gun I used to commit the murder. He didn't say that. We acknowledge that gun. There is no evidence that that was connected to the murder at all. But this, again, is going to corroborate what the defendant told Mr. Manzor. And at the time the defendant met with Mr. Manzor, defendant wasn't a suspect. They knew it was me, but they didn't have any evidence, as you all recognize, it's a circumstantial evidence case, to connect the defendant to the murder. Well, they had interviewed him several times, right? To the defendant. And the defendant didn't say anything. Didn't say anything. And it was only until he was in Cook County Department of Jail for the burglary that occurred, two years after the murder that occurred, and then two years before he tries to bring a piece of weapon into the Cook County Jail. So the jury heard Mr. Manzor. The jury also knew about Janice Lloyd. As you all are well aware, the state can't pick the witnesses. This was, these people were drug addicts. They were drug dealers. They smoked weed. And the defendant went with his cousin to go buy alcohol, to buy the weed. They went to get the crack cocaine. So this is, you know, Janice Lloyd is an admitted crack cocaine person, but the jury heard her. The jury saw her. And as a matter of fact, at sentencing, the trial court acknowledged these discrepancies, these witnesses. And she said, the jury believed these witnesses, and I believed these witnesses. So the jury had the opportunity to judge the credibility in a way, the evidence, and they found the defendant guilty based on that. With regard to the issue of whether, when we touched on it, the Beatrice of Rare, with regard to the other crimes evidence, again, it's her position that the state introduced that, not to corroborate the prosecution witness, but to show that the defendant did in fact confess and that that confession was real and reliable. On the jury instruction, what relevance does the fact that Mr. Othman asked Beatrice Herrera to carry a gun for him two years after the murder have to his intent? There's a disconnect between the jury instruction and the evidence. And I appreciate that, Your Honor. When they were talking about the motion eliminating, they were going back and forth because there were two issues that were being discussed. And then when they got to the Beatrice Herrera part during that motion eliminating, it was kind of like an offhanded, yes, we'll let her testify and we'll give a limiting instruction, and then you can cross-examine her on that. With regard to the IPI, we do recognize that the intent was a misstatement, that it was not offered at any point of intent. But if you read the instruction as a whole, you look at it, but it did alert the jury to the fact that they were to use that evidence not to show propensity, that it was only to be a limited way to view the evidence. At no point was the court trying to ensure that the jury would not consider it for anything other than what we had introduced it was not to be considered for propensity that this person is a bad person. And I think by the court giving a limiting instruction saying specifically, it's for you to determine whether a defendant was involved and only on this one issue, it was limiting what the jury could consider with regard to Beatrice's testimony. It may have caused confusion. It may have caused confusion, but I believe that when you read it as a whole, it did not violate defendant's rights because it did tell the jury that they couldn't consider that the defendant's a bad guy or propensity to commit other crimes. Now, with regard to the Zaire issue, we acknowledge that it was wrong. And, you know, sometimes you write a loss, but a judgment has all those things there and we wish you'd read all of them. But in this case, the judge did tap on a couple of those, Zaire, but she didn't say it. And we acknowledge it. But in Sebi, the defendant didn't, there was a defendant that presented a defense, witnesses in the state did. In this case, the defendant didn't present any evidence. And as I've already indicated, the evidence in this case was overwhelming. There's no indication that the jurors didn't consider or understand that the defendant doesn't have to testify and we have to prove him guilty beyond a reasonable doubt. Because that, some of those instructions are in the jury instructions. But the jury instruction on, or the Zaire question on the defendant not testifying, not being held against him, was not complete. It wasn't complete. And then he didn't testify. Right. So how is that not a problem? Well, I think that when you, that the defendant has a right not to testify, I think that jurors are reasonable people. They know common sense. And it is our position that although that wasn't the way we wanted it to work, if that were entirely true, we wouldn't need the Zaire principles. Well, that's true, Your Honor. But we have them. Yes, we do. And so if judges choose to wing it, there are consequences. Right. But I don't think this case is to be the case to show judges that they have consequences for not, for failing to give the 431B admonishments. Because we have a case where there is overwhelming evidence. Yeah, but does it then send the message that you don't need to give the jurors? I do not think it sends a message. I think you look at case by case. And in this case, this would not be the appropriate case to send a message. Well, I just, that's our position that this is not the appropriate case. Okay. You're saying that there's overwhelming. Well, let's keep in mind that it's overwhelming circumstantial evidence according to the State, but there is no direct evidence linking this man to this crime. Right. And the closest you come is Mr. Al-Kataba saying that he was going into the building and he saw, this is interesting to me, he saw the defendant going down, presumably from up someplace. Right. While Mr. Al-Kataba was going up, so they passed each other in the stairwell or something. But the victim lived in the basement. Right. So if the defendant was coming from the victim's apartment, the defendant would have been coming up and Mr. Al-Kataba would have just seen him coming up. Right. Whichever direction he was going in. But that's not what he saw. He saw the defendant coming down from someplace. And I just thought that that was just a little tiny idea of what was going on in this case. That this is so circumstantial that the State was just going to grab at anything. Well, I think the relevancy of the mechanic's testimony was the mechanic saw the defendant every day. The defendant said hi to him. And notably, the mechanic did state that he doesn't speak English well. And that's why he didn't call 911. I'm not saying that's why there's a disconnect between going up and down the stairs. But what I am saying is that this man saw the defendant every day and he was always cordial. And Mr. Al-Kataba was very important because he had left, he came back at 1230. So his timing is very relevant to the timing of when this occurred. Because Janice Floyd testified that the defendant came into their apartment around 11, 1130, threatening them with the weapon. Wait. Wait, wait. There was also testimony from Ms. Lloyd that he never left the apartment early in the morning. Well, she was asleep. Somebody saw him. Well, with regard to that. There's an inconsistency. Well, I give very little credence to that. Because she was asleep. She woke up at 10 o'clock. But that's following an alcohol and drug-driven eating. We don't know if she's sound asleep. But she didn't see the victim. The bottom line is the victim was back there at 10 o'clock when she woke up and she tried to wake up the victim to go to work. And then at 11, between 11 and 1130, all of a sudden she wakes up and there's the defendant with the gun brandishing, saying, Give me my money. You owe me my money. But with regard to, I mean, I understand what you're saying with the mechanic up and down. But, again, he testified before the jury credibly that he saw the defendant. The defendant didn't even acknowledge him. And then he finds out five minutes later that the victim had been killed. So we find that he was a credible witness. I mean, I just thought Mr. Akataga's testimony was very interesting because he said he saw the defendant all the time and then he didn't see him after the murder. Well, okay, maybe he just didn't go back because his uncle didn't live there anymore. And that could be one reason. But he also had family there and he had the family bakery there. So it's a little strange he wouldn't go back. His family was still intact. Maybe he should have gone back to support his family in this terrible time. But he did have connections to the neighborhood. And he did say that he didn't see him anymore. But that could cut both ways. And the jury was the one tasked with drawing the inference from that evidence. Exactly. I'd also like to touch on the cross-error argument. First, I do want to apologize that in my brief it did not contain those two statements that the defendant knew that he was being recorded. I'm the one who typed up the brief. I'm the one who inadvertently left it off. So I just want to let you know I apologize for that. But in any event, in our brief we did argue that that was not cross-error. Number one, the judge did not make any ruling regarding what occurred when Mr. Manzor testified. All the judge did was sustain an objection when Manzor was asked, how did the defendant feel? Objection, sustained. Then, after that was questioned, again, don't tell me how he feels. What was his demeanor? He was paranoid. So there was no ruling that the prosecutor did not abide by when, in closing arguments, he was talking about the facts of the case, was talking about everything that was there. And when he got to the discussion about the consensual over here, the state's attorney argued that Manzor said it was recorded, a small room, a guard was there. It's a reasonable inference that the defendant knew because the defendant was with Mr. Manzor. Mr. Manzor testified that he knew it was and so did the defendant. And it's also telling that the defendant, when he reached out to Mr. Manzor after their second meeting, saying, I want to tell you, I want to tell you some things, we don't know what those were. But the bottom line is there was no cross-error here. We proved defendant guilty beyond a reasonable doubt with all of our evidence. The jury heard all of that evidence. And with regard to the sentence, a 54-year sentence is not a life sentence and it's up to the Illinois Supreme Court to tell us what that 55-year is. But even if it is determined that the 55-year is a life sentence, if you look at this record and in this case the sentencing court did consider everything that Miller says and everything that Holman says that we should do. If you have no other questions. I do. Oh, yes. It's clear that a defendant is not entitled to a perfect trial. I think we all would agree. Anyone with a law degree would agree. But he or she is entitled to a fair trial. And when you have the issue with all of the errors combined that you've, some of which you've apologized for but you didn't address them in your brief and so forth, it gets to a point where, and then you topple that with the zero violation, which I don't see how we maintain the integrity of the judicial process if that alone is not enough for this court to send this case back. But all of these errors are not major, major errors. Well, the Supreme Court disagrees with you on the zero violation. Well, and as I've already said, and, you know, I wish that the judge had given the zero, but by the same token it was harmless based on the reasonable doubt argument that there was overwhelming evidence that the defendant's guilt. You have everything that the defendant told me as it was corroborated. You have a witness who placed the defendant in the apartment at 11 o'clock. And even though, as counsel argued, when a jailhouse snitch and a crack addict to prison doesn't mean that they're not credible and that they're not truthful. But there were no eyewitnesses to the murder. Right. No gun. Right. But you argue that the evidence is not closely balanced here. That's correct. And that's fine. That's your argument. But again, when we come back to what I believe to be the elephant in the room, which is the zero violation, and I don't know how we maintain the integrity of the judicial process if you say this is just not the case that you should send back and we don't need to send that kind of message to the circuit court judges. They need to know that it's okay for them to violate the Rule 431. Well, I think this trial was in 2015, and I'm positive this Court has already sent that message to the circuit court judges that they should follow the zero. But I'm also saying that cases have held that you can find a zero violation harmless where there is overwhelming evidence of the defendant's guilt. Well, picking up on Justice Walker's question about the cumulative errors, one of the errors that we haven't talked about is Lloyd's hearsay testimony that friends in the neighborhood told her that the defendant killed his uncle. And the defense counsel, as I understand it, did not object to that, which leads us to another problem. But on top of that, you've got now the jury hearing stuff that is uncorroborated, shouldn't have been allowed, is there. You can't unring the bell. They've got it in their heads that two days a day after, two days after, this is what you heard from unknown friends, friends in the neighborhood. All of that taken together, it seems to me, makes this a very dubious trial. Well, also you have to remember the neighborhood where this occurred. I mean, there's drug dealing going on. There's a myriad of criminal elements going on. And it would be reasonable that Janice is in the neighborhood. She's lived with the victim for a while. And then she had friends in the neighborhood. And they're the ones who told her. Because when she left that apartment, she left the apartment with the defendant with a gun telling her, if you're not part of this, get out of here. And saw him pointing the gun at the victim. And then she finds out from friends. But our position with regard to the ineffective assistance of counsel, if counsel had objected to that, that would have highlighted the fact that these people in the neighborhood are identifying defendants as the murderer. Not just saying, oh, the victim passed away and was shot. They're identifying the defendant. And that would call the jury's attention to the fact that the defendant, they would think, well, if people in the neighborhood are talking to the defendant, they must have seen something. So it was trial strategy for defense counsel not to object to that and just let the jury hear it without putting any credence to that. So when the counsel doesn't object, he doesn't preserve the error. So now, so you're suggesting that in some cases, don't object. No need to preserve the error. No need to highlight things. Well, this is, but it was trial strategy. First of all, they can't object to everything. And our position was, they can't object to everything. It's objectionable. They should object to everything. Well, that's true. And our position is. Otherwise it doesn't get before us. That's true. But this was not objectionable because it was highlighted, as I've already said, that people were identifying the defendant from the get-go and that the defendant was the one. And lawyers make decisions every day not to object. Split-second. Split-second decisions. Again, we urge this Court to hold the determination whether the term of years of a de facto sentence until the Illinois Supreme Court. But we really ask you to look, as you've already done, closely at the record. And we are confident that when you take it all together, there was overwhelming evidence that these errors were not as major, and that you affirm it based on all the reasons we stated at this argument and in our brief. Thank you. Thank you, Ms. Hatzenbuehler. Mr. Youn? Before you get to the merits of your rebuttal, Ms. Hatzenbuehler has suggested that we hold the case pending the Supreme Court's decision in Buffer regarding the term of years. What is your position on that? Well, in Buffer, you have a 50-year sentence applied to a 16-year-old, so he's getting out at 66. In our case, we have a bed who is 17, arrested at 21. That's where his sentence begins, 55 years, so he gets out at 76. And 76 here is clearly a life sentence, regardless of what the court decides in Buffer. So you don't agree that we should hold the case? You don't think Buffer will control the outcome? No. Well, this is a life sentence. That is our position. And our position is also that the newer factors were not considered. Just because a judge says, oh, I've considered the factors, that is not sufficient. We have that here where the judge mentions the fact that a bed left the gang in four years, and I don't want to stress this point too much, but she didn't consider that as mitigating. So the judge's words that, oh, I consider the factors, that should not be sufficient to comply with Miller. There needs to be actual wrestling with that issue to see whether this defendant is one of the few rare juvenile offenders that is beyond redemption. And that just wasn't done in this case. And, Judge Walker, Justice Walker, just to answer your question about the prosecutorial misconduct, it is de novo review. I'm sorry for not having an answer for that when you asked that question. But moving just to what the prosecutor said about Elia Munsoor and the corroboration, let's remember that the defendant, a bed, is very close to the victim, and him knowing details about the murder is not something that is unusual, that he knew that his cousin was shot three times, or that he knew where he died and the year that he died, and maybe even the caliber of bullet that was used. That sort of, that does not show that he was the murderer. They actually called each other uncle and nephew. Yes. So both of you referred to them as cousins. And they weren't technically first cousins, but they called each other uncle and nephew. Yes. This is a close, loving relationship from even the testimony that came out of the trial. How do you respond, though, to the prosecutor's argument that the evidence was not close, and that these errors are minor? I think that's just unrealistic to view evidence in that way. Again, there's no direct evidence here. All we have is, the only basis we have is these confessions from the professional jailhouse snitch from Mansard. And, again, this is. . . No, we also have the day of the murder confession to his friend. And your attack on his friend is that he was a competitor for Ms. Herrera's affections. That relationship lasted how long? It did a few weeks. A few weeks, sure. So the jury heard all that. And they heard that Offman showed up at his friend's house that day telling him, confessing to what he had done, and asking to stay there. Well, his friend told the police about this incident three years later, too.  So that's also. . . Mr. Offman told his friend that his uncle was murdered, or his cousin was murdered, when a gun went off accidentally. So maybe the friend decided, well, I don't have to go to the police and turn in my best friend. It was an accident. With all due respect, Your Honor, I feel that's speculating as to what the friend thought was going through his mind. I mean, I think here is. . . Juries who hear this testimony draw inferences. Sure, sure. Wasn't the jury entitled to credit the fact that Offman showed up telling his friend that he had murdered somebody? Sure. And I think that goes to the sufficiency of the evidence. But that doesn't mean the evidence is not close. I think if we're just discussing whether the evidence is close, I think there can be no dispute. If this case is not a close case, then what case will be a close case? We have just circumstantial evidence where you have at least credibility issues with each witness. And I will just point out the corroboration that the State talks about for Mansour. One of the corroborations, Beatrice Rehara's testimony about this gun, even if that was admissible other crimes evidence, our Supreme Court held in People v. Cruz, and essentially what they state is that you cannot use, and this is in your reply brief by the way, you cannot use other crimes evidence to corroborate a prosecution witness's testimony. So any corroboration that comes from Beatrice Rehara can just be disregarded by this Court. But she still corroborates defendant's statement to Mansour in prison that I have this girlfriend, Beatrice Rehara. So she could testify I was his girlfriend. That corroborates Mansour. Yeah, they were close friends in prison. He's going to tell him details about his life. But that's what corroboration is. Well, corroboration for the crime itself is, I think, different from corroboration about, oh, I talked to him about other things in my life, even about this event that happened. But corroboration that shows that he's the offender, that he's the actual murderer, there's nothing there that specific details about the crime. Now the state goes on about how it rained on the day that the gun was found. But how is that corroboration for that Mansour's testimony that actually hit the gun in the wall? We're talking about the corroboration that the trial court allowed was for the credibility of the jailhouse snitch. That his testimony, that this is what the defendant told me, is corroborated in a number of particulars. Well, our position is that that corroboration is due to the fact that it's not about the crime. It's just natural that that would be known by Mansour, because Mansour had pretended to act as a father figure to Abed in prison. And, of course, if they were going to have this close relationship, I would imagine that Abed is going to tell him things like, I had a girlfriend named Beatrice, or my cousin was shot three times. I mean, he's going to tell someone he's close to in prison this information. So it's just our position that that sort of corroboration really isn't corroboration in terms of showing that Mansour is telling the truth, telling the truth that Abed actually confessed to this offense. Not telling the truth about other things about his life. Sure, we'll agree with that, but telling the truth about Abed confessing to the crime, I think that's a far stretch from what we have here in the record. I just want to swing back to what Justice Mason just said. Her words were that the defendant told his friend, I murdered my uncle. But actually the friend testified that the defendant said, I shot my uncle, which would get by accident because we were fighting for the gun. So the defendant never actually said, I murdered my uncle, either to his friend or to Mansour. Well, but Mansour does testify, I mean, that's Mansour's false testimony. Now, I presume false testimony that Abed confessed to any crime. He said he didn't say murdered. Mansour testified, the friend testified that the defendant said, I shot my uncle by accident. That's true, yes. And Mansour, I thought, testified that the defendant told him, I killed my uncle. I mean, he described, I just want to be accurate with the facts of the case. He described how he was, Mansour did describe some of the shooting, that it was a shooting. But in terms of, again, Abed knowing facts about the murder, that's just not something that's unusual. I would imagine if you know someone and you're close to someone and that person is murdered, you're going to be interested in how that occurred. And for him to know those facts, that's just not an unusual thing. So the defendant never said to, Mansour never testified that the defendant told him, I shot my uncle. I killed my uncle. I murdered my uncle. Mansour testified that the defendant told him my uncle was killed with three bullets. Is that a correct statement? My recollection of the record is that what Mr. Mansour said was the defendant said, I could be in a lot worse position. I killed somebody two years ago. He didn't say it was his uncle. He said whoever he killed, he shot three times, once in the eye, twice in the head. And so that's the corroboration we're talking about, not whether it was his uncle. Well, that is Mansour's testimony that that's what Abed told him. And I'm thinking that Mansour is clever enough to take whatever Abed told him about this incident about this uncle, his cousin's death, and able to twist that into something where it seems more like a confession. But in any case, Mansour, the corroboration here is weak at best. And, again, our position is that it's insufficient to convict. But at the very least, the evidence here is very close. There's not much corroboration for Mansour's testimony. And, again, Janice Lloyd, you have, you know, she is not only a drug addict. Like, that's not the only issue with her testimony. In her initial statement to police, she said she never told the police about this drug debt that was essentially the basis for the motive, the state's theory, the motive for this murder. She didn't tell that to, and I forget, Detective Foster. Ms. Maroon, we've talked a lot about the credibility of witnesses, and I think we understand the issues. Sure. If you would limit yourself to rebuttal. Oh, sure. And, yeah, and just the last thing I would say, then, is the evidence is close. It doesn't have to be a credibility contest. The defense doesn't have to put forth witnesses. The defense, in people we know, in our Supreme Court, said that if reasonable jurors can disagree about the evidence, then the evidence is close, and that is certainly the case here. So, if Your Honors have no other questions, that would be it. All right. Thank you very much. Thank you so much. All right, counsel, excellent presentations this morning. You both wrote excellent briefs as well. We will take the case under advisement. Thank you for your arguments and your briefs, and thank you all for attending. Court will stand in recess.